IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ALBANY DIVISION

TOMMY MORRISON d/b/a Morrison          *
Motorsports and Morrison
Engineering and TOMMY MORRISON         *
MOTORSPORTS, INC.,[1]
                                       *
          Plaintiffs,
                                       *
vs.
                                       *     CASE NO. 1:03-CV-140(CDL)
EXXON MOBIL CORPORATION
                                       *
          Defendant.
_____        *


                    O R D E R

        Presently before the Court are Defendant's Second Motion for

Summary Judgment (Doc. 81) and Plaintiff Tommy Morrison's Motion for

Reconsideration (Doc. 132) of the Court's previous *ore tenus* order

refusing to reopen discovery to allow Plaintiff to identify a new

expert.  For the following reasons, the Court denies Plaintiff's

Motion for Reconsideration (Doc. 132), and grants Defendant's Second

Motion for Summary Judgment (Doc. 81).

                    BACKGROUND

        The present lawsuit arose out of a business relationship between

Defendant Exxon Mobil Corporation and Plaintiff Tommy Morrison.

Morrison has a professional connection to automotive racing and

testing, specifically as a Corvette race car driver.  The Corvette is

_____

        [1]For ease of reference throughout this Order, the Court will refer
to Plaintiffs collectively as "Plaintiff."

manufactured by General Motors ("GM"), and as a result of his racing experience and knowledge of the Corvette, Morrison developed a close relationship with GM employees, engineers and executives.

In 1984, Mobil Oil Corporation became a sponsor of Morrison's race team. At some point during the early part of their relationship, Mobil began to express an interest in exploiting Morrison's relationship with GM to promote a new, synthetic motor oil it had developed. Though this type of motor oil was more expensive than the kind typically used, it was a more durable product. Mobil desired to have its synthetic oil placed in GM vehicles as the factory fill motor oil.[2]

In 1987, Morrison entered into a one year personal services contract with Mobil. The parties renewed this contract for successive years. Copies of the 1993, 1994, and 1995 contracts show that one of Morrison's duties was to help improve Mobil's business relationship with GM. Specifically, the 1995 contract states:

> [Morrison] shall use his best efforts to facilitate the development of business relationships between Mobil and General Motors, including but not limited to *efforts to have Mobil 1 synthetic oil designated as original factory fill for automobiles manufactured by General Motors*.

---

[2]All vehicle manufacturers fill their vehicles with the necessary fluids on the production line. Mobil wanted GM to use its synthetic oil (Mobil 1 synthetic motor oil) as a factory fill motor oil. Ordinarily, the manufacturer does not specifically identify the brand used as factory fill, but Mobil wanted to develop a relationship with GM through which a "branded" factory fill would identify Mobil 1 oil as the factory fill used in GM production cars.

(Def.'s Mem. Supp. Second Mot. Summ. J., Ex. 6 ¶ 9) (emphasis added). The 1993 and 1994 contracts contain similar provisions, differing only in that they identify particular GM manufacturing divisions for which Morrison would receive a monetary bonus in the event he was able to secure a factory fill agreement for those divisions.

Mobil's sponsorship of the Morrison racing team was distinct from its individual contracts with Morrison. In 1995, Mobil decided to terminate the racing sponsorship agreement, and it appears that Morrison simultaneously opted to end his Corvette racing career. On September 14, 1995, Mobil sent a letter to Morrison informing him of Mobil's intent to end the sponsorship relationship. That letter proposed that the parties concentrate on Morrison's personal services, and suggested that the parties negotiate the next contract for a three year term. Despite Morrison's response that "a three year personal services contract should be beneficial to each of us[,]" (*id.* at Ex. 8) the parties never formalized this agreement and instead continued to perform their mutual obligations without a formal contract.

The parties again communicated about the substance of their agreement in January 1997. On January 27, 1997, Mobil wrote to Morrison explaining that they would provide "a fixed amount for personal services and a variable pay component which [would] allow [Morrison] flexibility to earn additional compensation based on the accomplishment of specific objectives." (*Id.* at Ex. 9.) Mobil

attached a document entitled "1997 Personal Services Agreement."
This document summarizes the proposed terms and bonus schedule, but
the parties again failed to execute a written contract formalizing
the terms of their 1997 agreement.

The parties followed the same procedure in January 1998, with
Mobil sending to Morrison a letter containing proposed contract
terms. The 1998 letter contains many of the same proposed terms as
the 1997 letter, except that where the 1997 letter provided Morrison
the opportunity to earn a $20,000 bonus for obtaining "[a] Mobil
endorsed agreement for Mobil 1 factory fill in a major General Motors
vehicle line," the 1998 letter set the bonus amount at "$xx." (*Id.*
at Ex. 10.) According to the letter, Mobil considered this objective
to be "above and beyond the scope of the personal services contract
and will be compensated at the [undetermined] contract fee." Again,
the parties never formalized this agreement, and there is no evidence
that they ever agreed to an amount for Morrison's factory fill bonus.
According to Morrison, however, Mobil executives had promised during
the earlier 1995-1996 negotiations that the fee for placing Mobil 1
in a GM line of cars would be "the biggest check [he'd] ever seen."
(Compl. ¶ 30.)

In 1999, Mobil Oil Corporation merged with Exxon Corporation to
form the Defendant corporation, Exxon Mobil. It was around this time
that Mobil chose not to renew Morrison's personal services contract
after the expiration of the agreement which extended through the end

4

of 1999.  The parties met in January 2000, where Morrison contends Defendant promised to "work things out" with respect to the factory fill issue.  This meeting appears to be the last time the parties met, and Morrison did not provide Mobil with any additional services in the year 2000.  It is clear that by the time Morrison's relationship with Mobil ended, Mobil and GM had not entered into a contract guaranteeing that Mobil 1 synthetic oil would serve as the factory fill oil for GM vehicles.

According to Defendant, it ended its relationship with Morrison because "[b]y the late 1990s, Mr. Morrison was largely ineffective in fostering Mobil's relationship with GM[,] . . . [and] was not providing any value to Mobil."  (Martin Aff. ¶ 4.)  It appears that Defendant made this determination on the basis that "from the mid-1990s until the time Mr. Morrison's relationship . . . ended . . . , [Defendant] did not secure any additional factory fill agreements with GM."  (*Id.*)

Ultimately, Defendant did reach an agreement with GM.  During the late-1990's, GM was "changing the way [it] did business" by using "creativity teams" as the appropriate method by which an individual or company could present ideas to GM.  (*See* Pls.' Case Summ. 6.)  The purpose of the change was to stop the "back door" approach previously used by people like Morrison.  After the merger, Defendant began to work through the GM creativity teams rather than utilize Morrison's services.  Defendant continued to meet with GM executives without

Morrison's involvement, and in June 2001, GM awarded Defendant the Cadillac factory fill contract. (*See* Scanlan Aff. ¶ 5, Ex. 1.) It is undisputed that Morrison was not directly involved "in soliciting, negotiating, or procuring" this contract, and that "[o]f the numerous individuals within GM who were involved in the decision . . . , none even mentioned Mr. Morrison." (*Id.* at ¶ 6.)

PROCEDURAL HISTORY

Morrison filed suit in 2003, alleging breach of contract, fraud, quantum meruit, and unjust enrichment. Under each of these theories, he sought to recover for Defendant's alleged failure "to compensate him for his successful performance . . . which resulted in and/or will result in lucrative factory fill agreements between Defendant and [GM]." (Compl. ¶ 50.) On December 15, 2004, Defendant filed its first Motion for Summary Judgment, and on September 28, 2005, Judge Louis Sands granted summary judgment on Plaintiff's breach of contract claim but denied summary judgment on the fraud, quantum meruit, and unjust enrichment claims. With respect to those claims, the court found genuine issues of material fact regarding (1) whether Defendant promised Plaintiff additional compensation without "any such intention to 'work out' [a] plan[,]" (2) "whether there existed an implied contract between [the parties] for Morrison to . . . help place Mobil 1 synthetic oil as factory fill in GM cars," and (3) "whether [Defendant] unjustly benefitted from Morrison's services." (*See* Order 8, n.4, 10-11, Sept. 28, 2005.)

6

Both parties filed motions with the Court shortly after the first summary judgment ruling. Defendant filed a motion asking the Court to reconsider its decision to deny summary judgment on the fraud, unjust enrichment, and quantum meruit claims. Plaintiff asked the Court to reopen discovery, arguing that "[d]ue to the late entry of Beauchamp & Associates [Plaintiff's newly retained counsel] in this matter, . . . and the late identification and retention of appropriate expert witnesses[,] . . . justice necessitates that [the Court] open discovery to allow Plaintiff[] to appropriately disclose expert testimony essential to the valuation of their claim." (Pls.' Refiled Mot. to Open Disc. 7.) On January 6, 2006, Judge Sands entered an Order simultaneously denying Defendant's Motion for Reconsideration as untimely and granting Plaintiff's request to reopen expert discovery. The Court ordered the parties to complete the additional discovery by March 7, 2006, and to file all dispositive motions no later than April 6, 2006.

During the period of extended discovery, Plaintiff disclosed a potential damages expert, Kevin McMahon, "to render [] opinions on the value of [] Morrison's services . . . ." (McMahon Depo. Ex. 9 at 3.) Defendant deposed McMahon in early February 2006, and filed a motion in limine to exclude his testimony on April 5, 2006.[3] Judge Sands denied Defendant's motion, without prejudice, deciding that

---

[3]A day later, on April 6, 2006, Defendant filed the presently pending Motion for Summary Judgment.

"resolution of damage issues raised in Defendant's [Second] Motion for Summary Judgment (Doc. 81) does not *require* the Court to determine the admissibility of any testimony Mr. McMahon's [sic] may present at trial." (Order 6, Sept. 5, 2006.)

At the time Defendant sought to exclude the testimony of Plaintiff's expert, his deposition was not complete. McMahon had refused to disclose certain sources that he deemed confidential, thus prompting Plaintiff to file a Motion for Protective Order to prevent the disclosure of that alleged confidential information. When Judge Sands denied Plaintiff's Motion for Protective Order, Defendant sought to resume McMahon's deposition to discover the sources of his information.

Unbeknown to the court, however, McMahon had formally withdrawn as Plaintiff's expert approximately one week after Defendant filed its motion in limine. McMahon informed Plaintiff's counsel that he was terminating his engagement "due to [the attorney's] breach and/or anticipatory breach" of that agreement for failing to maintain "the absolute confidentiality of [McMahon's] sources . . . ." (Pl.'s Aff. Ex. C at 1, Jan. 25, 2007.) The letter containing this information is dated April 13, 2006, almost five months prior to the Court's admissibility ruling. Plaintiff made no attempt to name a new expert during this period.

Plaintiff blames the debacle with his expert on previous counsel who has since withdrawn his representation. (*See generally* Pls.'

Resp. Def.'s Supp. Mem. Supp. Second Mot. Summ. J. 2-4.) Plaintiff acknowledges that "it was specific actions of [previous counsel] that caused the expert to withdraw[,]" noting that his previous counsel fired McMahon in March 2006. (*Id.* at 2.) However, prior to his filing on October 10, 2006, no such disclosure was ever made to the Court. In that October 10 memorandum, Plaintiff argued that (1) an expert is not necessary to create a genuine issue of material fact on damages, but (2) if the Court determines that an expert is necessary, Plaintiff ought to be allowed to substitute another expert.

On November 9, 2006, after an unsuccessful mediation attempt with Judge Sands, the case was reassigned to the undersigned. This Court held a hearing on Defendant's summary judgment motion on January 18, 2006. At the conclusion of that hearing, the Court denied Plaintiff's request to reopen the discovery period to allow Plaintiff to identify a new expert. The Court further indicated that it did not intend to reconsider Judge Sands's previous rulings regarding Defendant's first Motion for Summary Judgment, but that it would consider whether Defendant was entitled to summary judgment based upon Plaintiff's inability to prove its damages with reasonable certainty.

The Court must now decide whether it should reconsider its decision denying Plaintiff's motion to reopen discovery to identify a new expert. If the Court denies that request for reconsideration, the Court must then decide whether it should consider Plaintiff's

withdrawn expert's testimony in deciding Defendant's Motion for Summary Judgment. Finally, the Court must decide Defendant's presently pending Motion for Summary Judgment.

## EXPERT WITNESS ISSUES

Having reviewed the record, the Court denies Plaintiff's request that it reconsider its previous ruling denying Plaintiff the opportunity to identify a new expert. Plaintiff had ample opportunity to identify an expert witness in this case. First, the initial scheduling order provided adequate time for an expert to be identified. Plaintiff should have known when he filed the Complaint whether an expert was necessary on the damages issue. Plaintiff did not identify Mr. McMahon as an expert within the time required by the first scheduling order. Instead, Plaintiff sought to identify him beyond the deadline based in part upon Plaintiff's contention that the retention of new counsel justified the untimely identification of McMahon. The Court generously granted Plaintiff's request and allowed McMahon to be identified late. Furthermore, even after the relationship between Plaintiff's then counsel and McMahon deteriorated, Plaintiff had an opportunity to promptly notify the Court and seek to name a new expert. Plaintiff failed to act diligently and allowed several months to pass between the time Plaintiff's counsel fired McMahon and the date Plaintiff first notified the Court of the expert's withdrawal. Plaintiff's argument that he should not be held accountable for the actions of his counsel

is so devoid of merit that the Court's rejection of it does not require explanation. In summary, Plaintiff has failed to show good cause to reopen discovery to allow him to name a new expert.

Recognizing the apparent need for expert testimony to prove an essential element of his claim and in an attempt to salvage his case, Plaintiff seeks to resurrect McMahon as his expert notwithstanding his previous withdrawal. The problem with this attempted resurrection is that it is incomplete. Plaintiff does not seek to re-identify McMahon and otherwise make him available. Instead, he seeks to rely upon his previous deposition testimony to avoid summary judgment. Defendant opposes McMahon's limited revival. As Defendant points out, Defendant was unable to complete a full cross-examination of McMahon before he withdrew. McMahon's deposition testimony is therefore incomplete because the deposition was never resumed after Judge Sands denied Plaintiff's Motion for a Protective Order regarding the identification of the sources of some of McMahon's opinions. This issue in fact led to the rift between McMahon and Plaintiff's counsel. Allowing McMahon to be withdrawn and then subsequently re-identified without making him fully available for examination would cause Defendant undue prejudice. The Court finds that under these circumstances, where Plaintiff's counsel's own conduct contributed to the unavailability of the witness, and where the testimony proffered is incomplete and has not been subject to full and thorough cross examination, the probative value of McMahon's

testimony is substantially outweighed by the danger of unfair prejudice to the Defendant. Additionally, and perhaps more to the point, Plaintiff clearly withdrew McMahon as his expert. He should not now be allowed to rely upon the incomplete deposition testimony of a withdrawn expert, particularly given the fact that Defendant will not have any opportunity to fully explore the basis for all of his opinions. Accordingly, McMahon's deposition testimony shall not be considered in deciding Defendant's Motion for Summary Judgment. *See* Fed. R. Evid. 403; Fed. R. Civ. P. 32.

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the initial burden of showing that there is no genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). This may be accomplished by showing that the nonmoving party will be unable to "establish the existence of an element essential to [the nonmoving] party's case, and on which [the nonmoving] party will bear the burden of proof at trial." *Id.* at 322.

Once the moving party has met its burden, the burden shifts to the nonmoving party to "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks

omitted).  There is a genuine issue if the combined body of evidence, viewed in the light most favorable to the nonmoving party, would allow a reasonable jury to find in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In other words, the relevant inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Id.* at 251-52.

## DISCUSSION

Defendant contends that each of Plaintiff's remaining liability theories—fraud, quantum meruit, and unjust enrichment—fail as a matter of law.  Defendant made these same arguments to Judge Sands, who rejected them when he denied Defendant's first Motion for Summary Judgment.  Although the parties have completed additional discovery since Judge Sands's ruling, the Court finds that the newly discovered evidence does not warrant reconsideration of Judge Sands's ruling except as it relates to damages.  In light of the Court's exclusion of the testimony of Plaintiff's expert, the Court finds that Defendant's Motion for Summary Judgment should be reevaluated as to whether genuine issues of material fact exist regarding Plaintiff's ability to prove his damages with a reasonable degree of certainty.

## I.  Quantum Meruit and Unjust Enrichment

### A.  Measure of Damages

Plaintiff first seeks to recover for Defendant's breach of an implied contract to pay additional compensation for his success in helping Defendant obtain a factory fill agreement with GM. "The measure of damages under quantum meruit or unjust enrichment is based upon the benefit conferred upon the [recipient] and not the cost to render the service . . . ." *Hollifield v. Monte Vista Biblical Gardens, Inc.*, 251 Ga. App. 124, 130-31, 553 S.E.2d 662, 669 (2001) (alteration in original) (internal quotation marks and citation omitted). The specific value of services rendered "may be shown circumstantially or inferentially as well as directly or positively." *Centre Pointe Investments, Inc. v. Frank M. Darby Co.*, 249 Ga. App. 782, 786, 549 S.E.2d 435, 439 (2001) (footnote omitted). It is generally proper to permit a jury to determine the monetary amount of the reasonable value of the services rendered. *See id.* ("Determining the reasonable value of the services is the task of the jury[.]"). However, since it is Plaintiff's burden to establish that he suffered a recoverable injury, "[w]here [his] claim for damages is remote or speculative, summary judgment for the defendant is appropriate." *The Hip Pocket, Inc. v. Levi Strauss & Co.*, 144 Ga. App. 792, 793, 242 S.E.2d 305, 307 (1978). Moreover, even if Plaintiff can establish the amount of benefit conferred upon Defendant with reasonable certainty, it does not follow that Plaintiff is entitled to recover

the entire amount of that benefit. It is still incumbent upon Plaintiff to prove the reasonable value of the services he rendered. *Folds v. Barber,* 278 Ga. 37, 597 S.E.2d 409, 410 (2004). The determination of the amount of this value cannot be left to speculation, conjecture, or guesswork. *Id.* Therefore, the Court must apply a two-step analysis in deciding whether Plaintiff produced sufficient evidence to create a genuine issue of material fact as to the amount of his damages. First, the Court must determine whether the benefit conferred upon the Defendant can be determined with a reasonable degree of certainty. Second, the Court must decide whether the value of Plaintiff's services in contributing to that benefit can be calculated with a reasonable degree of certainty.

B. Evidence of Damages

1. *Alleged Benefit Conferred Upon Defendant*

Plaintiff submits that the total benefit to Defendant from the Cadillac contract includes both the direct sales and the "increased distribution that arose from the [] agreement—the so-called 'aftermarket[.]'" (*Id.* at 9-10.) Construing the evidence in Plaintiff's favor, as is required at this stage of the proceedings, the Court finds that there are genuine issues of material fact regarding the amount of benefit Defendant derived from the direct sales of its product to GM. Conversely, the Court finds that the evidence is insufficient to create a genuine issue of material fact

as to the amount of benefit conferred upon Defendant due to increased distribution in the aftermarket.

a.    **Amount of Value from the Factory Fill Contract**

As a result of the Cadillac agreement, Defendant enjoyed the "direct benefit" of its guaranteed sales to GM of the amounts of Mobil 1 oil needed as factory fill. As evidence of the amount of Defendant's "direct benefit," Plaintiff submits year-to-date production totals from the GM website and the letter by which GM notified Defendant "of the approval of [its] business recommendation to award [Defendant] a long term contract for supply of [factory fill oil]" for Cadillac vehicles. (Pls.' Resp. Def. Supp. Mem. Supp. Second Mot. Summ. J. Ex. F.) Using the year-end production totals reported on GM's website for model years 2002 through 2006, Plaintiff estimates a yearly production average of 2,930,919 "qualified" GM vehicles. (*See id.* at Exs. A, B, C.) The letter provides a "summary of the approval award for the long-term contract" and states as follows:

> [GM's] projected planning volume [for Cadillac vehicles] equates approximately 13,500 gallons MY2003, 117,000 gallons MY2004, 325,000 gallons MY2005 and 500,000 gallons MY2006.
>
> The pricing will be fixed for the period at $9.70USD per gallon. Reductions of 1% will be calculated off the final pricing effective MY2004, MY2005 and MY2006.

(*Id.*) Plaintiff assumes that each vehicle would require 1.25 gallons of motor oil, and that Defendant would receive the contract price of $9.70 per gallon. Multiplying the number of qualified vehicles by

1.25 gallons per vehicle, at $9.70 per gallon, Plaintiff concludes that his services provided Defendant with a total direct benefit of $248,761,729 over a seven-year term.

To survive summary judgment, however, this evidence must be sufficient to permit a trier of fact to determine the amount of Plaintiff's recovery "with reasonable certainty." *See James E. Warren, M.D., P.C.*, 272 Ga. App. at 237, 612 S.E.2d at 21. For several reasons, the Court finds that Plaintiff's evidence is insufficient.

Plaintiff based his calculations on the historical average yearly production of "qualified vehicles" as listed in GM's published reports from 2002 to 2006. (*See* Pls.' Resp. to Def.'s Supp. Mem. Supp. Second Mot. Summ. J. Ex. A.) These reports provide production statistics on a variety of GM vehicles, organized by model year and production facility, indicating how many of each vehicle a given facility produced during the relevant time period. However, even assuming that these reports are admissible business records, they do not provide relevant evidence of the "benefit" Defendant derived from Plaintiff's services. There is nothing in the record to suggest that GM's published production figures represent the number of vehicles for which it agreed to purchase Mobil 1 oil as factory fill. Additionally, the reports provide no basis for Plaintiff's apparent conclusions that Defendant's contract with GM (1) began in model year 2002, (2) covered a seven-year term, and (3) provided that Mobil 1

17

oil would be used as factory fill in every GM vehicle produced.[4]  If the website reports do not reflect the actual terms of the parties' contract, the figures contained therein are irrelevant to the calculation of the amount of value Defendant received as a result of Plaintiff's services.

The only evidence of the parties' actual agreement is the letter Defendant received from GM.  Unlike the published production reports, this letter at least makes clear that on June 14, 2001, GM approved a "business recommendation to award [Defendant] a long term contract for supply of [] Synthetic Engine Oil . . . for [GM] North American Factory Fill – Cadillac – Mobil 1 Synthetic Oil Strategy."  (*Id.* Ex. F.)  Additionally, the letter provides a "summary of the approved award . . . through MY2006[.]"  (*Id.*)  Admittedly, this letter is not the final contract and there is no evidence that the parties ever incorporated the terms of this letter into their final contract. However, construing this evidence in the light most favorable to Plaintiff, the letter indicates that (1) Defendant sold to GM a total of 955,500 gallons of Mobil 1 oil from 2003 to 2006 and (2) GM paid Defendant $9.70 per gallon, with a one percent reduction of the final price in 2004, 2005, and 2006.  Thus, a reasonable fact finder could

---

[4]Although Plaintiff limits his analysis to "qualified vehicles," it is impossible to determine how Plaintiff "qualifies" a particular vehicle as relevant to his calculation of damages.  The Cadillac agreement is the only evidence on record that Defendant ever obtained a factory fill contract with GM, and although the reports indicate that GM produced approximately 200,000 Cadillacs in model year 2002 (*see id.* Ex. B), Plaintiff numbers the 2002 "qualified vehicles" at 2,861,614.  (*See id.* Ex. A.)

conclude that Defendant received a "reasonably certain" amount of benefit as a result of its factory fill agreement with GM. The same cannot be said for Plaintiff's contention that Defendant benefitted from aftermarket distribution of its product attributable to the GM contract.

### b.    Amount of Value from Aftermarket Sales

Plaintiff also claims that Defendant realized an "indirect benefit" from the Cadillac contract. Specifically, Plaintiff contends that Defendant received the benefit of increased aftermarket sales of Mobil 1 oil "because the [Cadillac] owner's manual recommends the Mobil 1 brand, the oil caps are Mobil 1 branded, *etc.*, and these branding items encourage customers to utilize that brand of motor oil for future oil changes." (Pl.'s Supp. Br. Opp. Sum. J. on Issue of Damages 10.)

To calculate the amount of Defendant's indirect benefit, Plaintiff again relies on the published production totals from the GM website. Using the same number of "qualified" vehicles, Plaintiff estimates that each vehicle owner would purchase at least ten oil changes in 100,000 miles. Estimating that each oil change will require 1.25 gallons of oil, Plaintiff concludes that Defendant will sell approximately 256,455,391 gallons of aftermarket Mobil 1 oil as a result of the Cadillac contract. At an average purchase price of $10.00 per gallon, Plaintiff contends that the residual sales of

Mobil 1 oil which may be linked to the Cadillac contract amount to $2,564,554,906.

Despite Plaintiff's conclusions, however, there is simply no evidence on record which would allow a jury reasonably to determine that Defendant realized a two-and-a-half billion dollar residual benefit from the Cadillac contract. To begin, Plaintiff again bases his calculations on the irrelevant production reports he obtained from the GM website. The only relevant production numbers are those on which GM purchased Mobil 1 oil as factory fill, and the website reports do not reflect those figures. Additionally, there is nothing in the record to substantiate Plaintiff's assumption that more than 200,000,000 oil changes have been performed on the "qualified" GM vehicles. While it may be reasonable to accept Plaintiff's conclusion that a vehicle owner would periodically change his motor oil, Plaintiff has failed to meet his burden of presenting "reasonably certain" evidence of (1) the number of oil changes purchased by GM vehicle owners or (2) the frequency with which Mobil 1 oil was chosen as the replacement oil. Finally, Plaintiff failed to meet his burden of establishing the "benefit" to Defendant of these aftermarket sales. To establish the price per gallon of aftermarket Mobil 1 oil, Plaintiff submitted a receipt from Advance Auto Parts. (*See* Pls.' Resp. Def.'s Supp. Mem. Supp. Second Mot. Summ. J. Ex. D.) The receipt indicates that an Advance Auto Parts customer would pay $23.03 for a gallon of Mobil 1 oil, but it fails

to indicate the amount Defendant received from the retailer. It also fails to explain the $10.00 per gallon figure Plaintiff used in his calculation of Defendant's benefit from such sales. Although the Court assumes that there is a genuine issue of fact as to *whether* Defendant derived a residual benefit from the Cadillac contract, there is no evidence establishing the *amount* of that benefit. Therefore, to the extent Plaintiff alleges that his services provided value to Defendant through the aftermarket sales of Mobil 1 oil, Defendant is entitled to summary judgment on Plaintiff's quantum meruit and unjust enrichment claims for his failure to establish the value of his services with "reasonable certainty." *See James E. Warren, M.D., P.C.*, 272 Ga. App. at 237, 612 S.E.2d at 21.

2. *Value or Benefit Attributable to Plaintiff's Services*

As previously explained, sufficient evidence exists from which a reasonable jury could determine the amount of benefit Defendant derived from its factory fill contract with GM. However, Plaintiff is not automatically entitled to recover the full amount of that benefit. Rather, he must produce evidence from which a reasonable jury could conclude with reasonable certainty the value of his services in producing that benefit. *See Folds,* 278 Ga. at 38; 597 S.E.2d at 410. Plaintiff has produced no such evidence. To calculate the value of Plaintiff's services in contributing to that benefit would require impermissible conjecture, speculation, and guesswork. The Court rejects Plaintiff's contention that once he

21

produces evidence as to the amount of the entire benefit Defendant received, he is relieved of producing any evidence to show the value of his contribution to that entire benefit. The Georgia Supreme Court has made clear that simply establishing the amount of the benefit is insufficient. In *Folds v. Barber,* the plaintiff made referrals of real estate business to the defendant which resulted in commissions for the defendant in the amount of $77,000. The plaintiff then sought to recover part of the commissions the defendant received as a result of those referrals. However, plaintiff produced no evidence as to the value of her services in producing those commissions other than the fact that the referrals contributed to the defendant's total commissions of $77,000. Like the Plaintiff in the case at bar, the plaintiff in *Folds* maintained that she conferred a benefit upon the defendant and ought to be compensated to avoid the defendant's unjust enrichment. Rejecting this argument, the Georgia Supreme Court explained that in order to recover under a quantum meruit theory, "it was incumbent upon [the plaintiff] to prove the reasonable value of the services she rendered." *Id*. at 410. Since the plaintiff presented "no evidence by which the [factfinder] with any degree of certainty could determine the reasonable value of [her] services as a whole[, and since the] question of damages cannot be left to speculation, conjecture and guesswork[,]" she could not recover. *Id.* (first alteration in original). Likewise, Plaintiff in the case at bar has

produced no evidence from which a reasonable jury could determine with any degree of certainty the reasonable value of his services. Accordingly, Defendant's Motion for Summary Judgment is granted as to Plaintiff's quantum meruit and unjust enrichment claims.

## II. **Fraud**

### A. Measure of Damages

The final remaining issue is whether the Court should grant summary judgment on Plaintiff's fraud claim for failure to produce sufficient evidence of recoverable damages. Under Georgia law, "[f]raud without damage, or damage without fraud, gives no cause of action, but when these two concur an action lies." *Brooks v. Dime Sav. Bank of N.Y., FSB*, 217 Ga. App. 441, 442, 457 S.E.2d 706, 708 (1995) (quotation marks and internal citation omitted). A plaintiff making a claim for fraud must show "that actual damages, not simply nominal damages, flowed from the fraud alleged." *Zieve v. Hairston*, 266 Ga. App. 753, 759, 598 S.E.2d 25, 32 (2004) (quotation marks and internal citation omitted); *see also Central Auto Sales, Inc. v. Poore*, 272 Ga. App. 221, 222-23, 612 S.E.2d 59, 61 (2005) ("[T]he measure of damages . . . is the actual loss sustained as a result of the fraud."). Although the term "actual damage" encompasses more than just pecuniary loss, *see Zieve*, 266 Ga. App. at 759, 598 S.E.2d at 32, "[t]he party claiming damages carries not only the burden of proving the damages, but also furnishing the jury with sufficient data to estimate the damages with reasonable certainty." *Central*

23

*Auto Sales, Inc.*, 272 Ga. App. at 222, 612 S.E.2d at 62; *see also Brooks*, 217 Ga. App. at 442, 457 S.E.2d at 708 ("[D]amages cannot be left to speculation, conjecture and guesswork.").

B.   Evidence of Damages

Here, Plaintiff claims that Defendant fraudulently induced him to provide the services which ultimately led to Defendant's procurement of the Cadillac factory fill agreement.   Assuming *arguendo* that there is a jury question as to Defendant's liability for fraudulent inducement, Plaintiff nevertheless has failed to meet his burden of "furnishing . . . sufficient data to estimate [his] damages with reasonable certainty."   *Central Auto Sales, Inc.*, 272 Ga. App. at 222, 612 S.E.2d at 62.

As a result of Defendant's alleged fraudulent behavior, Plaintiff claims to have suffered "actual damage" in (1) "being deprived compensation for his efforts in pursuing factory fill agreements with General Motors," (2) "continuing to provide services to Defendant at a greatly reduced rate," and (3) "declining to pursue other business opportunities and fully capitalize on his relationship with General Motors."   (Compl. ¶ 82.)   In short, Plaintiff claims to have suffered his lost opportunity cost: If Plaintiff had provided the same services to a third party, he would have been compensated. Thus, the "actual damage" of Defendant's alleged fraud is Plaintiff's loss of the value of his services.   Other than Plaintiff's own statements, and the inadmissible deposition testimony of his proposed

expert, there is no evidence to establish what a third party would have paid to Plaintiff, or what is routinely paid to others who provide the same or similar services. Plaintiff's own self-serving statements do not create a genuine issue of material fact as to the value of his services. *See Smith v. Fed. Express Corp.*, 191 Fed. App'x 852, 855 (11th Cir. 2006) (explaining that summary judgment is appropriate where there is no evidence to support plaintiff's allegations other than his own self-serving statements); *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) ("For factual issues to be considered genuine, they must have a real basis in the record[;] . . . [M]ere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion."). In the absence of other evidence to support his conclusions, Plaintiff's own valuation estimates are nothing more than "speculation, conjecture and guesswork." *See Brooks*, 217 Ga. App. at 442, 457 S.E.2d at 708. Therefore, the Court grants Defendant's Motion for Summary Judgment with respect to Plaintiff's fraud claim on the basis that Plaintiff failed to "furnish[] . . . sufficient data to estimate [his] damages with reasonable certainty." *Central Auto Sales, Inc.*, 272 Ga. App. at 222, 612 S.E.2d at 62.

## CONCLUSION

For the reasons stated in this order, Plaintiff's Motion for Reconsideration (Doc. 132) is denied, and Defendant's Second Motion for Summary Judgment (Doc. 80) is granted.

IT IS SO ORDERED, this 28th day of March, 2007.

S/Clay D. Land
_____
CLAY D. LAND
UNITED STATES DISTRICT JUDGE
